IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE SCHMELTZER, | ) | CASE NO. 1:11CV01361 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Defendant. | ) | |

Plaintiff Denise Schmeltzer ("Schmeltzer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Schmeltzer filed her application for disability insurance benefits and supplemental security income benefits on July 19, 2007.  Tr. 117-121.  The application alleged a disability onset date of September 5, 2005.  Tr. 117.  Schmeltzer alleged disability based on severe sleep apnea which caused physical weakness, severe fatigue, and an inability to concentrate.  Tr. 144. After initial denials by the state agency (Tr.77-82, 88-92), Schmeltzer requested a hearing (Tr. 93), and an administrative hearing was held before Administrative Law Judge Traci M. Hixson (the "ALJ") on April 27, 2010.  Tr. 31-72.

In her May 28, 2010, decision, the ALJ determined that Schmeltzer had not been under a disability since September 5, 2005.  Tr. 26.  Schmeltzer requested review of the ALJ's decision by the Appeals Council on June 26, 2010.  Tr. 7-10.  On June 9, 2011, the Appeals Council denied Schmeltzer's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.     Personal and Vocational Evidence

Schmeltzer was born on September 24, 1970, and was 36 years old at the time of her application (Tr. 117), making her a younger individual under the Social Security regulations.  20 C.F.R. §§ 404.1563, 416.963.  At the time of the hearing, Schmeltzer was never married, had no children, and resided with her mother.  Tr. 117-121.  Schmeltzer graduated from Euclid High School in 1989 and achieved grades placing her in the upper quartile of her class.  Tr. 175. However, she did not receive any further educational or vocational training following graduation. Tr. 148.

Schmeltzer's past relevant work includes experience as a library assistant, as an assistant manager, and in retail sales.  Tr. 24.

### B.     Medical Evidence

#### 1.   Physical Impairments

##### a.     Treating Medical Providers (MetroHealth Hospital System)

Prior to her alleged disability onset date Schmeltzer was treated at MetroHealth Hospital for a multitude of health problems.[1]  Tr. 365-676.  Though Schmeltzer claims a disability onset date of September 5, 2005, she alleges that health issues preceding that date contribute to her complete inability to perform work at any level.  Doc. 13, p. 3.  Schmeltzer's prior health complaints include, inter alia, headaches, migraines, congestion, lethargy, knee pain, shoulder pain, weight gain, constipation, bloating, poor concentration, and fatigue.  Doc. 13, pp. 4-8.  From 2003 to 2005, Schmeltzer was treated with both surgical and non-surgical procedures combined with various medications.  Doc. 13, pp. 4-8.  Notably, Schmeltzer underwent surgery to correct a deviated septum, which had caused pain and "empty nose syndrome."[2]  Tr. 376, 378.  To remedy the empty nose syndrome, Schmeltzer underwent surgery in December 2003 to receive nasal implants.  Tr. 383, 385, 394.  These implants were subsequently modified and replaced.  Tr. 440, 479.  Unable to adequately relieve Schmeltzer's fatigue and poor concentration, Dr. Steven M. Houser ("Houser") referred Schmeltzer to Dr. Dennis H. Auckley ("Auckley"), a pulmonologist, for a sleep study.  Tr. 485-486.

In September 2005, Schmeltzer underwent her first sleep study by polysomnogram testing (PSG) and was diagnosed with obstructive sleep apnea (OSA).  Tr. 186.  With an Apnea-Hypopnea Index (AHI) of 16.8, Schmeltzer's apnea fell within the low-end of "moderate" sleep apnea.  Tr. 186.  Additionally, she suffered no clinically significant desaturations below 90%.  Tr. 187.  In December 2005, Schmeltzer underwent a second sleep study, this time with CPAP titration. Tr. 187. Auckley noted that Schmeltzer's OSA responded well to the treatment, which

---

[1] The record indicates that the majority of Schmeltzer's treatment at MetroHealth Hospital System was provided by the following physicians: Steven M. Houser, M.D., ENT; Dennis H. Auckley, M.D., Pulmonologist; Vidya Krishnan, M.D., Pulmonologist; Aishwarya Palwai, M.D.

[2] The date of the original operation is unclear, but the surgery in 2003 by Dr. Houser was a "revision septoplasty." Tr. 394.

reduced the AHI to 3.0, and that she suffered no significant desaturations below 90%. Tr. 187. However, he noted that Schmeltzer did not tolerate the CPAP well. Tr. 187.

In January 2006, Houser advised Schmeltzer to attend a CPAP class to find a suitable interface and also to pursue weight control measures. Tr. 516. If the class and weight-loss were unsuccessful, Houser recommended several surgical options, including Uvulopalatopharyngoplasty (UPPP), tonsillectomy, radiofrequency treatments to the bottom of the tongue and palate, and pillar implants. Tr. 516. In February 2006, Schmeltzer still had not attended any CPAP class, though she claimed to have one scheduled. Tr. 518. She expressed interest in pillar implantation. Tr. 518.

In March 2006, Houser again discussed available treatment options with Schmeltzer, which included observation, medical therapies, and surgical intervention. Tr. 180. Schmeltzer elected surgical intervention and underwent a pillar implantation procedure in April 2006. Tr. 522. At her two-week follow-up appointment, Schmeltzer complained of mild pain and reported no reduction in snoring and no relief from fatigue. Tr. 524. Houser suggested waiting a few more weeks to assess the pillar implantation's success. Tr. 524. By May, 2006, Schmeltzer reported "softer" snoring and better rest, but also required modification of the left implant due to irritation. Tr. 526. Houser removed 5-6 mm of the implant to reduce irritation. Tr. 528. In July 2006, an additional pillar was implanted. Tr. 190.

Her symptoms persisting, Houser again referred Schmeltzer to Auckley for a third sleep study, performed in October 2006. At this time she still had not attended any CPAP class. Tr. 190. The third study revealed an AHI of 57.5, with no desaturation below 90%, resulting in a diagnosis of severe OSA. Tr. 187, 190. Again, the study indicated that Schmeltzer did not tolerate CPAP well. Tr. 190.

In November 2006, Schmeltzer finally attended a CPAP class but was unable to tolerate the positive pressure of the CPAP machine—even with nasal pillows.  Tr. 186.  On December 4, 2006, Auckley noted that the worsening apnea may be attributable to different sleeping positions and medications.  Tr. 184.  During her first sleep study in September 2005, Schmeltzer (1) was at a slight incline or elevation, (2) did not sleep in a supine position, and (3) was on Ambien.  Tr. 184.  During the October 2006 study she (1) was instructed to lay totally flat, (2) slept in a supine position, and (3) was on Xanax.  Tr. 184, 190.  Consequently, Auckley opined that the severity of the OSA measured in the October study may have been "overestimated."  Tr. 184.  In December 2006, Auckley recommended repeating the CPAP class with nasal pillows and seeking additional alternatives from Houser, including the potential for oral devices and further surgical options.  Tr. 187.

In January 2007, Houser again explained treatment options to Schmeltzer, including UPPP, radiofrequency treatments to the tongue and palate, and oral devices.  Tr. 190.  During this discussion, Schmeltzer was "reticent to consider UPPP," but showed some interest in radiofrequency treatments and oral devices.  Tr. 190.  Houser noted, that while more surgery was an option, Schmeltzer was more comfortable with less invasive procedures, specifically radiofrequency treatments to the bottom of the tongue (BOT) and palate, repeated if necessary.  Tr. 190.

In February and June of 2007, Schmeltzer had two radiofrequency ablation procedures to the BOT and palate.  Tr. 199, 260.  In July 2007, after the second radiofrequency treatment, Houser again discussed potential treatment options.  Tr. 211.  Houser noted that remaining surgical options were limited to UPPP, repose tongue stitch, or a tracheotomy.  Tr. 211.  In November 2007, Schmeltzer underwent a third radiofrequency treatment.  Tr. 266.  On her

follow-up visit with Houser in December 2007, they again discussed possible treatments, including a potential fourth radiofrequency treatment as well as a repose system or tracheotomy. Tr. 269.

In April 2008, Schmeltzer had a fourth radiofrequency procedure. Tr. 329. Afterwards, Schmeltzer made clear that she did not want the UPPP surgery and would again try CPAP and another sleep study. Tr. 327. In early June 2008, Schmeltzer underwent her fourth sleep study, again showing severe OSA, with an AHI of 41.3 and no oxygen desaturations below 90%. Tr. 317. Auckley diagnosed her apnea as "clinically significant," warranting treatment with either CPAP, oral device, or surgery. Tr. 318. Additionally, Auckley commented that Schmeltzer needed counseling on sleep hygiene; specifically he advised that she should not drink caffeinated beverages before bed, and that she should stay out of bed except to sleep. Tr. 318.

In late June 2008, Schmeltzer told Houser that she wished to discontinue CPAP treatment. Tr. 311. Her alternatives included BOT reduction by repose suture or by ablation, and a tracheotomy. Tr. 311. Schmeltzer intimated she was most interested in the tongue excision by ablation, but Houser needed to further research the procedure. Tr. 311.

In August 2008, Schmeltzer attempted a fifth sleep study but was unable to complete the entire test because she woke up and felt unable to fall back asleep. Tr. 299.

In January 2009 (Tr. 296) and again in November 2009 (Tr. 352), Schmeltzer met with Houser to discuss her remaining treatment options.[3] Schmeltzer again demonstrated interest in BOT reduction via ablation but Houser required more information on how to localize the lingual

---

[3] By 2009, Schmeltzer had undergone five sleep studies, received Pillar implants, attempted sleeping with a CPAP machine, undergone four radiofrequency ablation treatments, and tried various prescriptions. Her remaining options were UPPP, repose tongue stitch, oral devices, and BOT reduction by ablation.

arteries before performing the procedure.  Tr. 296.  As of November 2009, Houser was not in a position to perform the BOT reduction via ablation.  Tr. 352.

Although Schmeltzer received treatment over a number of years, none of her treating physicians at MetroHealth Hospital provided a statement regarding her physical capacities.  Tr. 248.

### b.      State Agency Reviewing Physician

*Sarah Long, M.D.*

On November 13, 2007, Sarah Long, M.D. ("Long") completed a Physical RFC Assessment.[4]  Tr. 242-249.  Long opined that Schmeltzer had no exertional, visual, communicative, or manipulative limitations.  Tr. 243, 245-246.  Long opined that Schmeltzer should never climb ladders/ropes/scaffolds but that she had no limitation on her ability to climb ramps/stairs, stoop, kneel, crouch and crawl.  Tr. 244.  Long opined that Schmeltzer should avoid exposure to environmental hazards, such as machinery and heights, but had no other environmental limitations.  Tr. 246.  In support of her conclusions, Long noted that Schmeltzer suffers from sleep apnea and fatigue but is independent in self-care and can drive and shop.  Tr. 246.  Long regarded Schmeltzer's allegations of severity to be "generally credible."  Tr. 247.

### 2.  Mental Impairments

### a.      Treating Medical Providers

*Terese Notte, L.S.W.*

Schmeltzer was seen by Terese Notte ("Notte"), a medical social worker, for individual therapy on September 22, 2009.  Tr. 360-362.  Schmeltzer's physician referred her to Notte

---

[4] On February 21, 2008, Nick Albert, M.D., reviewed the evidence on file and confirmed Long's RFC as written. Tr. 291.

because she was experiencing symptoms of depression.[5] Tr. 360. Notte reported Schmeltzer was cooperative and alert, but anxious and depressed. Tr. 361. Notte also noted that she became tearful several times during the exam. Tr. 361.

Schmeltzer complained to Notte about her inability to effectively cope with the changes in her life since being diagnosed with sleep apnea. Tr. 360. She told Notte that she had always defined herself by her work and her ability to contribute and had worked full-time throughout her twenties. Tr. 360. But she also claimed to "really struggle" in her twenties, that she suffered from verbal and emotional abuse by her mother, and that she was depressed, hopeless, helpless and even suicidal. Tr. 360. While Schmeltzer was never treated by a psychiatrist, she was "involved in counseling" in 2001-2002 that was very helpful, and tried various drugs prescribed by her family doctor. Tr. 360.

Notte opined that Schmeltzer's information appeared to be reliable. Tr. 361. Notte diagnosed Schmeltzer with Depressive Disorder (not otherwise specified) and with some symptoms of anxiety. Tr. 361. Notte assessed Schmeltzer's Global Assessment of Functioning ("GAF") score at 50.[6] Tr. 360. Notte recommended psychiatric treatment but Schmeltzer was uninterested at the time. Tr. 361.

*Madhuri Medarametl, M.D.*

Madhuri Medarametl, M.D. ("Medarametl"), performed a psychiatric evaluation of Schmeltzer on March 1, 2010. Tr. 355. Medarametl noted that Schmeltzer appeared alert and

---

[5] The record is unclear as to who Schmeltzer's primary care physician was at the time, but indicates that Houser was most likely the referring physician.

[6] GAF considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington D.C., American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideations, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." Id.

oriented and that her grooming and hygiene were very good.  Tr. 357.  Medarametl also noted

that Schmeltzer did not appear tired at all despite her claims of constant fatigue.  Tr. 357.  In fact,

Medarametl thought that she seemed "energetic."  Tr. 357.  Medarametl assessed Schmeltzer's

anxiety and depression as secondary to her physical problems, and included in his notes doubts

about the validity and extent of her condition based on her reluctance to seek follow-up

treatment.  Tr. 357.  Schmeltzer told Medarametl that she voluntarily stopped treatment for her

hypothyroidism, sleep apnea, and anxiety.  Tr. 357.  Additionally, Schmeltzer indicated that she

missed appointments with two separate counselors on multiple occasions.  Tr. 356.  In

conclusion, Medarametl generally believed Schmeltzer's claims but with some reservation due to

her reluctance to pursue treatment and attend follow-up appointments.  Tr. 357.  Medarametl

started Schmeltzer on Celexa, ordered her to get blood work, recommended a new counselor,

suggested she obtain a primary care physician immediately, and ordered her to return in two

weeks.  Tr. 357.

Two weeks after their first visit, Schmeltzer returned to Medarametl on March 16, 2010.

Tr. 363.  Schmeltzer reported no improvement and increased dizziness.  Tr. 363.  She was

reluctant to discuss her apnea, noting that she "did not want to go that route again," nor get her

hopes up.  Tr. 363.  Schmeltzer had not obtained the blood work ordered for her at the last

appointment.  Tr. 363.

Again, Medarametl noted that Schmeltzer was "very well dressed with good grooming

and hygiene," and that she appeared "very alert."  Tr. 363.

9

**b.** **State Agency Consultative Examiner**

*Richard C. Halas, M.A.*

On October 22, 2007, Schmeltzer was evaluated by clinical psychologist Richard Halas,

M.A. ("Halas").  Tr. 213-216.  Halas' report indicates that Schmeltzer presented herself in a

"reasonably neat and generally well-kept manner."  Tr. 213.  She was oriented, cooperative, and

appropriately motivated for the exam.  Tr. 213.  Her overall dress and grooming were normal.

Tr. 213.  Schmeltzer appeared to comprehend the importance of her exam yet minimized or

denied her health problems.  Tr. 213.  Schmeltzer's speech was slow and constricted but lacked

any specific poverty of speech or perseveration of responses.  Tr. 213.  She maintained

consistent, quality eye contact during the exam.  Tr. 213.  She reported that her appetite was

normal and her appearance showed adequate nourishment.  Tr. 213.  Halas reported Schmeltzer's

most concerning behavior to be a flat, hesitant and tentative presentation.  Tr. 213.

Schmeltzer claimed to have trouble sleeping at night and told Halas that she normally

went to bed around midnight, fell asleep around 1:00 AM, woke up four to five times throughout

the night, and got out of bed by 11:00 AM.  Tr. 214.  Halas observed Schmeltzer cry and become

tearful during the exam.  Tr. 214.  She described her energy level as poor and admitted to feeling

helpless, hopeless, and worthless.  Tr. 214.  She claimed to suffer claustrophobia and panic

attacks when closed-in, but did not shake, pace, fidget, or hyperventilate.  Tr. 214.

Halas noted that her feelings of guilt stemmed mostly from her diminished ability to

support herself financially.  Tr. 214.  While Schmeltzer alleged panic attacks, Halas observed

only low levels of anxiety and did not notice any symptoms consistent with an anxiety disorder.

Tr. 214.  Additionally, Halas noted that Schmeltzer did not display any symptoms consistent with a thought disorder or psychotic process during his consultation.  Tr. 214.

Halas diagnosed Schmeltzer with a non-specific Depressive Disorder and a non-specific Anxiety Disorder (noting some phobic-like problems).  Tr. 215.   Halas noted that her psychologic stressors included unemployment, financial concerns, and her dependency on her mother.  Tr. 215.  Halas assigned Schmeltzer a GAF score of 55 with moderate symptoms of depressive disorder and anxiety; he noted that her functional severity was slightly higher at 60, but adopted the lower of the two scores for the overall assessment.[7]  Tr. 215.  Halas assessed Schmeltzer's four mental-related work abilities as follows:

1. Ability to relate to others, including peers, supervisors, and the public: Moderate Limitations (restricted by depressive disorder)

2. Ability to follow simple one- and two-step instructions: Intact (no intellectual deficit)

3. Ability to maintain attention and perform simple, repetitive tasks: Intact (able to recall six digits forewords)

4. Ability to withstand the mental stress associated with most day-to-day work settings: Mild Limitations

### c.    State Agency Reviewing Physician

#### *Mel Zwissler, Ph.D.*

On November 11, 2011, Mel Zwissler, Ph.D. ("Zwissler") completed a Psychiatric Review Technique (Tr. 224-237) and Mental Residual Functional Capacity Assessment (RFC).[8] Tr. 238-241.  He reviewed Schmeltzer's alleged impairments under Listings 12.04 (Affective

---

[7] A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends).  American Psychiatric: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.

[8] Bruce Goldsmith, Ph.D. reviewed the evidence on file and affirmed Zwissler's assessment on February 14, 2008. Tr. 290.

Disorders) and 12.06 (Anxiety Disorders) and determined that her impairments did not satisfy the diagnostic criteria but did find that Schmeltzer suffered from Depressive Disorder (not otherwise specified) and Anxiety Disorder (not otherwise specified).[9]  Tr. 224-229.  Zwissler found mild limitations in activities of daily living and moderate limitations in both maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 234.  Zwissler did not find evidence that Schmeltzer (1) had experienced any episodes of decompensation for an extended duration, (2) was unable to function outside of a highly supportive living arrangement, or (3) would decompensate as the result of a marginal adjustment in mental demands or change in environment.  Tr. 235.  Consequently, Schmeltzer failed to meet the criteria set forth by paragraphs "B" and "C" of the Listings.  Tr. 235.

In his Mental RFC, Zwissler did not find any marked limitations.  Tr. 239.  Zwissler found moderate limitations in the following seven areas: (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) to interact appropriately with the general public; (5) to accept instructions and respond appropriately to criticism from supervisors; (6) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (7) to respond appropriately to changes in the work setting. Tr. 238-239.  In the other thirteen areas, Zwissler found either no evidence of limitation or that Schmeltzer was not significantly limited.  Tr. 238-239.

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

Zwissler gave weight to the psychological consultative examiner's report and noted that Schmeltzer's statements were generally credible.  Tr. 240.  He summarized his findings by stating that she would be no more than moderately limited in her ability to relate to others, maintain concentration, persistence, and pace, or adapt to changes.  Tr. 240. Finally, Zwissler concluded that Schmeltzer would do best in a relatively static setting with only superficial interactions and a slow pace.  Tr. 240.

## C.    Testimonial Evidence

### 1.    Schmeltzer's Testimony

Schmeltzer was represented by counsel and testified at the April 27, 2010, hearing. Tr.31-72.  She testified regarding her physical and mental ailments and capabilities; her living arrangements, including living with her mother her entire life; her ability to care for herself with assistance from her mother; her daily living activities, including napping, reading, watching some television, shopping for personal items, dressing herself and taking care of her own personal hygiene; her sleep apnea and treatments, including pillar implants, radiofrequency ablation, CPAP, and prescription drugs; her fatigue and resulting lack of concentration; her depression; her work history, including her responsibilities as a card merchandiser, library assistant, secretary, and assistant manager; her rotator cuff injury; her inability to participate in hobbies; her ability to lift, stand, walk, manipulate objects, climb stairs, crawl, and eat with utensils; her capacity for tolerating crowds; her memory; the fact that her driver's license was issued without restrictions; and the remaining treatment options for her sleep apnea.  Tr. 34-61.

### 2.    Vocational Expert's Testimony

 Vocational Expert Carol Mosley, M.A. ("VE") testified at the hearing.  Tr. 64-71.  After reviewing Schmeltzer's vocational history, the VE testified that Schmeltzer's work as a library

assistant was classified as "light" and her work as a card merchandiser and assistant manager as "medium."  Tr. 65-66.  The VE testified that Schmeltzer had some skills that would transfer with little vocational adjustment, specifically retail sales skills, managerial skills, and customer service skills.  Tr. 66.

The ALJ posed different hypotheticals to the VE.  First, she asked the VE whether an individual based on the following hypothetical could return to Schmeltzer's past work:

> I would just need you to assume a few things.  Assuming we had a hypothetical person of the same age, education, and employment background as Miss Schmeltzer, this person is lifting and carrying twenty pounds occasionally, ten pounds frequently.  This person is standing and walking for six hours and sitting for six.  This person is occasionally climbing stairs and ramps, bending and balancing, stooping, kneeling, and crawling.  This person is reaching in all directions.  This person can handle, finger, and feel.  We're not going to expose this person to any hazardous conditions.  We're going to say this person is performing simple, routine tasks with simple, short instructions, simple work-related decisions with few workplace changes. This person is having minimal contact with the public, but could interact with co-workers and supervisors.

Tr. 67.  The VE testified that an individual based on the hypothetical could not perform Schmeltzer's past work as a library assistant (precluded by public contact), a card merchandiser (precluded by the amount of exertion and public contact required), or an assistant manager (precluded by stress and complicated tasks).  Tr. 68.

The ALJ then asked the VE whether there would be any jobs available to an individual in the national and regional economy based on the hypothetical presented.  Tr. 68.  The VE testified that yes, there was a full range of light, unskilled work available in the national and regional economy and her examples included: kitchen worker, light packer, cleaner, and bench assembler.  Tr. 68-69.

The ALJ posed a second hypothetical to the VE, and asked the VE whether there would be any jobs available to an individual in the national and regional economy based on the following:

> [This person has] the same limitations except for this person could only lift ten pounds occasionally, and was only standing and walking for two hours and sitting for six . . . occasionally climbing stairs and ramps, bending, balancing, stooping, kneeling, crawling, reaching in all directions, handling, fingering, and feeling, but no hazardous conditions, [performing only] simple, routine tasks, [with] minimal public [interaction], but able to interact with co-workers and supervisors.

Tr. 69-70.  The VE testified that yes, there were sedentary, unskilled jobs available in the national and regional economy and his examples included: inspection worker, assembler, and sorter.  Tr. 70-71.

The ALJ then posed the following variation to the previous hypothetical, and asked the VE whether there would be any impact on the light, unskilled or the sedentary, unskilled employment opportunities:

> If we were to add the fact that due to fatigue, this person was going to need extra rest-periods during the day. So in addition to the normal morning, lunch, and afternoon break, this person was going to need another three to four breaks per day, and these breaks are going to be at least ten minutes a piece. Would that have any impact to either the light or sedentary jobs that you've mentioned?

Tr. 71.  The VE testified that there would be no jobs available in the national or local economy for such an individual.  Tr. 71.  The VE testified that his testimony was consistent with the information contained in the Dictionary of Occupational Titles DOT.[10]  Tr. 71.  Schmeltzer's counsel indicated that she did not have any questions for the VE.  Tr. 64-65.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

---

[10] The Dictionary of Occupational Titles is published by the Department of Labor.  See 20 CFR § 404.1566(d)(1).

>[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; see also *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

16

**IV. The ALJ's Decision**

In her May 28, 2010, decision, the ALJ determined that Schmeltzer had not been under a disability since September 5, 2005, the alleged disability onset date.  Tr. 26.  The ALJ reviewed the record, heard testimony and found that:

1. Schmeltzer met the insured status requirements of the Social Security Act through September 30, 2005.  Tr. 18.

2. Schmeltzer had not engaged in substantial gainful activity since September 5, 2005, the alleged onset date.  Tr. 18.

3. Schmeltzer had the following severe impairments: obstructive sleep apnea, hypothyroidism, depressive disorder, and anxiety disorder.  Tr. 18.

4. Schmeltzer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  Tr. 19.

5. Schmeltzer had the residual functional capacity ("RFC") to: lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk six hours in an eight hour workday; occasionally climb stairs and ramps; bend, balance, stoop, kneel, or crawl; perform simple, routine tasks with short instructions and simple work-related decisions with few workplace changes; sustain minimal public contact, and could interact with coworkers and supervisors; but she was unable to work in environments with exposure to hazards.  Tr. 20.

6. Schmeltzer was unable to perform any past relevant work.  Tr. 24.

7. Schmeltzer was a younger individual on the alleged onset date.  Tr. 25.

8. Schmeltzer had at least a high school education and was able to communicate in English.  Tr. 25.

9. Transferability of job skills was not an issue because Schmeltzer was "not disabled" regardless of whether or not she had transferable job skills.  Tr. 25.

10. Considering Schmeltzer's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Schmeltzer could perform, specifically: kitchen worker, packer, bench assembler, and cleaner.  Tr. 25.

11.     Schmeltzer was not under a disability from September 5, 2005, through May 28, 2010, the date of the ALJ's decision.  Tr. 26.

## V. Parties' Arguments

### A.     Plaintiff's Arguments

Schmeltzer presents only one issue for this Court's review—whether the ALJ improperly assessed Schmeltzer's credibility.  Doc. 13-1, p. 14.  Schmeltzer argues that the ALJ's decision was not properly grounded in fact and sufficiently articulated.  She relies on Social Security Ruling 96-7p and *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234 (6th Cir., 2007).  Doc. 13-1, pp. 14-15.

### B.     Defendant's Arguments

The Commissioner argues that substantial evidence supports the ALJ's decision that Schmeltzer is not disabled.  Doc. 15, p. 9. Further, the Commissioner contends that the ALJ's decision includes specific references to evidence in the case to adequately explain the ALJ's reasoning and credibility determination.  Doc. 15, pp. 10-11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Despite Schmeltzer's contentions, the ALJ's findings are supported by substantial evidence.

**A.      The ALJ properly assessed Schmeltzer's credibility.**

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's statements about symptoms, including fatigue.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 SSR LEXIS 4, at *5–8 (1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference,

particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir.1997)).  Here, the ALJ considered the entire case record and conducted a thorough credibility analysis.  Tr. 20-24.

The ALJ determined that Schmeltzer satisfied the first step, i.e., that she had a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged.  However, the ALJ also that determined Schmeltzer's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC.  Tr. 21.  The ALJ did not deny that Schmeltzer suffered from fatigue, an inability to concentrate, or physical weakness—rather, the ALJ found that her symptoms do not limit her functionality beyond the assessed RFC, and thus do not preclude her from performing a range of light work.  Tr. 21-26.

In her decision, the ALJ reviewed, inter alia: (1) Schmeltzer's written statements; (2) her testimony; (3) her earnings records; (4) the sleep study results; (5) her inability to tolerate a CPAP mask; (6) the treating physician's (Houser's) recommendations and treatment history; (7) her sleep specialist's (Krishnan's) recommendations and notes; (8) her prescription drug treatments; (9) the impact of her mental impairments on her ability to respond to treatment (although the mental impairments were not alleged by Schmeltzer to be functionally limiting); and (10) the state agency physicians' opinions about her functional capacity.  Tr. 21-24.  These specific references by the ALJ demonstrate a thorough review of the entire case record. Schmeltzer merely disagrees with the ALJ's subsequent reasoning.  Doc. 13-1, pp. 15-20. However, as discussed below, Schmeltzer's arguments are unpersuasive and do not warrant a

reversal of the ALJ's credibility determination which is to be accorded great weight and deference.

Schmeltzer argues that the ALJ did not fully credit the evidence of her subjective symptoms, including fatigue and weakness.  However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.2003).  In this case, substantial evidence supports the ALJ's decision not to credit fully Schmeltzer's complaints about her subjective impairments and their effects on her ability to work.  She is able to drive for errands, navigate public transportation, prepare some meals, care for her personal hygiene without assistance, engage in meaningful conversation, and maintain the requisite concentration to read for fun.  *See Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir.1993) ("The ALJ may consider the household and social activities in evaluating complaints of disabling pain or other symptoms.").

The ALJ also considered the treatment Schmeltzer received from her ENT, Dr. Houser. Tr. 19-24.  Houser provided Schmeltzer the most extensive and continuous treatment of any medical provider in the record.  Tr. 164.  However, Houser did not provide an opinion on her functional capacity or limitations.

The ALJ's thoroughness concerning the credibility analysis is further evidenced by the ALJ's review of the medical opinions of Dr. Halas, Dr. Zwissler, and Dr. Long.  Even though, as one-time medical examiners, their opinions were not entitled to controlling weight, the ALJ considered each of the opinions and weighed them in accordance with the applicable regulations. Tr. 23-24.  See 20 C.F.R. § 416.927.  These physicians who evaluated Schmeltzer never concluded that her symptoms were totally disabling.  Dr. Halas concluded that Schmeltzer had

mild to moderate limitations on her ability to relate to others and withstand everyday stress.  Tr. 216.  Dr. Zwissler found no marked mental limitations and moderate limitations in only seven of twenty assessed areas.  Tr. 238-239.  Zwissler concluded that Schmeltzer would be no more than moderately limited in her ability to relate to others, maintain concentration, persistence, and pace, and adapt to changes.  Tr. 240.  Dr. Long opined that, physically, Schmeltzer had no exertional, visual, communicative, or manipulative limitations.  Tr. 243, 245-246.  Dr. Long only recommended Schmeltzer not climb ropes, ladders, or scaffolds and that she avoid environmental hazards. Tr. 244, 246.

Schmeltzer asserts that her work history after the alleged onset date was significantly less than in prior years and argues that this work history is evidence that her medical condition impacted her ability to work.  Doc. 13-1, p. 15.  But a review of the entire record provides a clearer picture.  Schmeltzer fails to recognize that, in the eighteen years before her alleged onset date (1987-2004), she earned, on average, less than $3000 a year.  Tr. 122-123.  In nine of those eighteen years she earned less than $1000, substantiating the ALJ's finding of inconsistency and indicating that her history of unemployment predates any severe medical impairment.  Tr. 21, 122-123.  Moreover, Schmeltzer admits that she last worked full-time in 1999 (Tr. 42)—six years prior to the alleged onset date and four years before any relevant medical records.  Doc. 13-1, p. 15.

Schmeltzer disputes the ALJ's contention that she failed to seek treatment for her alleged disabling condition, listing numerous visits to the hospital prior to the alleged onset date.  But Schmeltzer does not distinguish between visits to treat her OSA and visits to treat everything else, including trips to a gastroenterologist and an orthopedic physician.  Doc. 13-1, p. 16.  The ALJ points out that Schmeltzer, after finally discovering what may be the true cause of her

symptoms, failed to seek treatment to alleviate that specific cause (OSA) for six months.  Tr. 21.
This properly raised doubts about the accuracy of Schmeltzer's subjective complaints regarding
the severity of her symptoms.

Schmeltzer challenges the ALJ's findings regarding "conservative medical care."  Doc.
13-1, pp. 16-17.  She argues that the ALJ's reliance on Dr. Krishnan's August 20, 2008, medical
treatment notes is misplaced.  Doc. 13-1, pp.16-17.  In the August 20, 2008, treatment notes, Dr.
Krishnan states that Schmeltzer ". . . is so resistant to most [of] all therapies advised . . . ." Tr.
309.  Dr. Krishnan also stated that, if Schmeltzer could not tolerate CPAP, there were other
options available to her, i.e., surgical or oral appliance, and he recommended that she try to
manage her bedtime routine to achieve better sleep.  Tr. 308-309.  Schmeltzer argues that,
because "[n]owhere did Dr. Krishnan note concern that Ms. Schmeltzer was not aggressively
treating her sleep apnea" (Doc. 13-1, p. 17), the ALJ's credibility determination was flawed.
However, a review of the ALJ's decision as well as the foregoing August 20, 2008, treatment
notes, reveals that the ALJ properly relied on these treatment notes in concluding that the
intensity, persistence, and limiting effects of Schmeltzer's sleep apnea symptoms, i.e., fatigue,
were not as severe as she described.  The ALJ did not pass judgment on Schmeltzer's choice of
treatment but, rather, considered the fact that, while other treatment options were available,
Schmeltzer did not pursue or was "resistant" to those other options.  Also, the ALJ noted that
Schmeltzer testified that she had been advised that there were no other surgeries available when
in fact the medical records indicate alternatives were discussed with her.  Tr. 22, 55-57; Tr. 190,
311, 516.  Schmeltzer argues that the ALJ should not have held against her Dr. Houser's inability
to perform the bottom of the tongue coblation procedure.  Doc. 13-1, pp. 16-17.  This argument
is without merit.  The ALJ did not hold Dr. Houser's inability to perform said procedure against

her; he noted that this procedure was an option available to Schmeltzer along with other procedures such as tracheotomy and repose suture tongue stitch.  Tr. 22, 296.  Moreover, the ALJ referenced these alternate procedures when she recounted Schmeltzer's testimony that she had been advised that there were no other treatment options available to her.  Tr. 22.  The inconsistency between Schmeltzer's own testimony that there were no other treatment options available and the medical record evidence supports the ALJ's findings that Schmeltzer's testimony concerning the intensity, persistence, and limiting effects of her symptoms was less than credible.

Schmeltzer argues that the record shows that she suffered from severe sleep apnea and therefore the ALJ's conclusion that there is a "relative lack of strongly positive clinical signs documented in the treatment notes" is error.  Doc. 13-1, pp. 17-18.  The ALJ accepted and found that Schmeltzer suffers from a severe impairment of obstructive sleep apnea.  Tr. 18.   However, he did not find her statements concerning the intensity, persistence, and limiting effects of her OSA to be credible.  As noted and relied upon by the ALJ, treatment notes dated March 1, 2010, state that Schmeltzer "did not appear tired at all despite claiming that she is constantly fatigued. Client appeared energetic in the session." Tr. 22-23, 357.  Also, as noted and relied upon by the ALJ, March 16, 2010, treatment notes reflect that, again, Schmeltzer complained of debilitating fatigue but did not appear tired and was unwilling to discuss her sleep apnea.  Tr. 22-23, 363. The foregoing is substantial evidence to support the ALJ's findings, whereas Schmeltzer only points to her own complaints and fails to bolster those allegations with any objective evidence in the record not wholly derived from her own words.  Doc. 13-1, pp. 17-18.

Schmeltzer asserts that the ALJ's disagreement with portions of Dr. Halas' and Dr. Long's opinions on the basis that they gave insufficient weight to Schmeltzer's subjective reports

is inconsistent with the ALJ's own findings that Schmeltzer was less than credible.  Doc. 13-1, p. 18.  But the ALJ's suggestion that Dr. Halas and Dr. Long should have been <u>more receptive</u> to Schmeltzer's complaints actually indicates the ALJ's willingness to provide Schmeltzer the most favorable consideration possible based on the record.  Further, as the Commissioner points out (Doc. 15, p. 18.), awarding these physicians' opinions greater weight would not help Schmeltzer because neither found her unable to perform work.  Tr. 216; Tr. 242-249.

Schmeltzer faults the ALJ for not citing more specific, verifiable reasons for discounting her credibility and argues that the ALJ improperly relied on only a few of Schmeltzer's own statements.  Schmeltzer highlights evidence from the self-report to support her claims regarding the severity of her fatigue, such as staying in bed all day and bathing less frequently.  Doc. 13-1, p. 18.  The ALJ cited portions of the report that conflict with Schmeltzer's own testimony.  Tr. 24.  For example, Schmeltzer said she cannot drive because of fatigue (Tr. 153), yet she testified that she does drive.  Tr. 35.  Further, the ALJ acknowledged Schmeltzer's description of limited daily activities.  Tr. 24.  However, the ALJ did not find objective evidence to verify those alleged limitations and, even if Schmeltzer's daily activities were as limited as described, the ALJ determined that the degree of limitation could not be attributed to her medical condition as opposed to other reasons, especially in view of the relatively weak medical evidence and other factors that the ALJ discussed.  Tr. 24.  Schmeltzer's reliance on additional evidence to refute the ALJ's findings does not negate the substantial evidence supporting the ALJ's decision.  *Jones,* *336 F.3d. at 477* (a court cannot reverse the Commissioner "so long as substantial evidence also supports the conclusion reached by the ALJ" even when there is substantial evidence to support a claimant's position).

While the ALJ must make the reasoning clear for subsequent review, there is no rigid formula or framework that must be followed, and Schmeltzer fails to show any authority to the contrary.  Also, this case is distinguishable from *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007), relied on by Schmeltzer, because, in Rogers, the ALJ used a credibility determination to contradict at least three treating physicians' opinions that included more severe limitations than reflected in the RFC.  Here the RFC does not contradict any opinion other than Schmeltzer's own.  Further, the ALJ here used actual inconsistencies in the record to discredit Schmeltzer's statements and did not rely on any "intangible or intuitive notion."  Tr. 22-23 (citing Schmeltzer's treating physician; "Client did not appear tired at all despite her claiming that she is constantly fatigued.  Client appeared energetic in the session." (Tr. 357); and "She appeared refreshed and did not appear tired despite claiming 'debilitating fatigue.'" (Tr. 363)).

As demonstrated herein, Schmeltzer's attempts to fault the ALJ's credibility determination are to no avail.  It is the province of the ALJ, an not the reviewing court, to evaluate the credibility of witnesses, including the claimant, and such credibility findings are entitled to great deference.  *Rogers*, 486 F.3d at 247 (6th Cir. 2007); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Here, as discussed, the ALJ's credibility determination is supported by the record and is sufficiently explained; it was not based upon an intuitive notion about Schmeltzer's credibility.  The ALJ followed the applicable procedures for assessing Schmeltzer's credibility, she reviewed and considered the full record, noted inconsistencies to discredit Schmeltzer's subjective statements regarding the severity of her symptoms and their impact on her functional capacity, and articulated the bases for her conclusion.  Because substantial evidence supports the ALJ's

credibility determination and conclusion that Schmeltzer can perform light work, the

Commissioner's decision should not be overturned.

## V.  Conclusion and Recommendation

For the foregoing reasons, it is the undersigned's recommendation that the

Commissioner's decision be **AFFIRMED**.

Dated:  June 26, 2012

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).